

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

**FILED**

JAN 0 6 2016

Phil Lombardi, Clerk
U.S. DISTRICT COURT

(1) ROBBIE EMERY BURKE, as the
Special Administratrix of the Estate of
Eric Harris, Deceased,

    Plaintiff,

v.

(1) STANLEY GLANZ, in his individual
capacity,
(2) ROBERT C. BATES,
(3) MICHAEL HUCKEBY,
(4) JOSEPH BYARS,
(5) RICARDO VACA, and
(6) RICHARD WEIGEL, in his official
capacity as Acting Tulsa County Sheriff,

    Defendants.

**16 CV - 7 JED - FHM**

ATTORNEY LIEN CLAIMED
JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW, Plaintiff Robbie Emery Burke ("Ms. Burke"), as the Special Administratrix of the Estate of Eric Harris, Deceased ("Mr. Harris" or "Harris"), and for her causes of action against the above-named Defendants, alleges and states the following:

### INTRODUCTORY STATEMENT

1. On April 2, 2015, Mr. Harris died as proximate result of Defendant, and former Reserve Deputy, Robert C. Bates' ("Bob Bates", "Bates" or "Reserve Deputy Bates") unreasonable and excessive use of deadly force. Specifically, Bates shot Mr. Harris in the back, at close range, with a .357 revolver, at a time when Mr. Harris was unarmed, not fleeing arrest and had been subdued by as many as four (4) other deputies. It is clearly established that "deadly force cannot be used when it is unnecessary to restrain a suspect or secure the safety of



officers, the public, or the suspect himself...." *Weigel v. Broad,* 544 F.3d 1143, 1155 (10th Cir. 2008). Further, "'there undoubtedly is a clearly established legal norm' precluding the use of violent physical force against a criminal suspect or detainee 'who *already has been subdued and does not present a danger to himself or others.'*" *Estate of Booker v. Gomez,* 745 F.3d 405, 424-34 (10th Cir. 2014) (quoting *Harris v. City of Circleville,* 583 F.3d 356, 367 (6th Cir. 2009)) (emphasis added). Here, Bates' use of deadly force on Mr. Harris, when he had already been subdued and did not present a danger to himself or others, was patently excessive and prohibited as a matter of clearly established law.

2. Bates killed Harris during the course of an ostensibly dangerous undercover sting operation conducted by the Tulsa County Sheriff's Office's ("TCSO") Violent Crimes Task Force. At the time, Bates was a 73-year-old insurance executive moonlighting as a Reserve Deputy. However, Bates lacked the requisite training, by hundreds of hours, to participate in such a field operation. Indeed, Bates was not even certified to carry the .357 revolver as his service weapon. The .357 revolver, which was used to gun Mr. Harris down in the street, was Bates' personal firearm, and had not been approved by the TCSO.

3. Bates is the longtime friend and financial supporter of Defendant, and former Tulsa County Sheriff, Stanley Glanz ("Sheriff Glanz"). Well before Mr. Harris was shot dead, Sheriff Glanz knew that Bates did not have the necessary training or certifications to engage in TCSO's field operations. Sheriff Glanz knew that Bates was not proficient with a firearm and posed a significant risk to the public. Yet, in a shameful display of cronyism run amok, Sheriff Glanz turned a blind eye to these dangers, in violation of his own policies and the United States

2

Constitution, in order to allow his friend and financial benefactor to "play cop" in the streets of Tulsa County. Eric Harris needlessly died as a direct consequence.

## PARTIES, JURISDICTION AND VENUE

4. Plaintiff, Robbie Emery Burke ("Ms. Burke"), is a resident of Tulsa County, Oklahoma, and the duly-appointed Special Administratrix of the Estate of Mr. Harris. The survival causes of action in this matter are based on violations of Mr. Harris's rights under the Fourth Amendment and Oklahoma Law.

5. Defendant Stanley Glanz ("Sheriff Glanz" or "Defendant Glanz") was at times relevant hereto, the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of state law. Defendant Glanz, as Sheriff and the head of the Tulsa County Sheriff's Office ("TCSO"), was, at times relevant hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of TCSO, including the policies, practices, procedures, and/or customs that violated Mr. Harris's rights as set forth in this Complaint. In addition, Sheriff Glanz was, until November 1, 2015, responsible for TCSO's law enforcement field operations, including its Reserve Deputy Program. Defendant Glanz is sued in his individual capacity.

6. Defendant Robert C. Bates ("Bob Bates" or "Bates"), is a resident of Tulsa County, State of Oklahoma. Bates was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as an employee or agent of the TCSO.

7. Defendant Michael Huckeby ("M. Huckeby"), is a citizen of Oklahoma. M. Huckeby was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as an employee or agent of the TCSO.

8. Defendant Joseph Byars ("Byars"), is a citizen of Oklahoma. Byars was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as an employee or agent of the TCSO.

9. Defendant Ricardo Vaca ("Vaca"), is a citizen of Oklahoma. Vaca was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as an employee or agent of the TCSO.

10. Defendant Richard Weigel ("Acting Sheriff Weigel" or "Defendant Weigel") is the Acting Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of state law. Defendant Weigel has been Acting Sheriff since November 1, 2015, when former Sheriff Glanz resigned. Acting Sheriff Weigel is sued purely in his official capacity as acting Sheriff. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). On April 5, 2016, there will be a special general election to elect a new Tulsa County Sheriff. At that point, Acting Sheriff Weigel will cease to hold office. Nonetheless, Rule 25(d) of the Federal Rules of Civil Procedure provides that "[a]n action does not abate when a public officer who is a party in an official capacity dies, resigns, or

4

otherwise ceases to hold office while the action is pending", rather "[t]he officer's successor is automatically substituted as a party."

11. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

12. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

13. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

14. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

15. Paragraphs 1-14 are incorporated herein by reference.

### A. Sheriff Glanz and the Reserve Deputy Program (Generally)

16. Defendant Sheriff Stanley Glanz ("Sheriff Glanz") was first elected Tulsa County Sheriff in 1989.   Clark Brewster, who now serves as defense

counsel in multiple civil rights cases against Sheriff Glanz, was Sheriff Glanz's first campaign manager. Sheriff Glanz was re-elected six (6) times. Sheriff Glanz resigned as Sheriff, effective November 1, 2015.   Over his long tenure, Sheriff Glanz vanquished would-be challengers by terminating TCSO employees whom he believed might pose a political threat.

17. As Sheriff, Sheriff Glanz was the final policymaker for the Tulsa County Sheriff's Office ("TCSO").   With respect to a county sheriff's law enforcement duties, Oklahoma law specifically provides that "[i]t shall be the duty of the sheriff, undersheriffs and deputies to keep and preserve the peace of their respective counties...." 19 Okla. Stat. § 516.  By policy, Sheriff Glanz also had a duty to "maximize resources and improve the quality of service provided by the Sheriff's Office." Chapter 1, Policy 1, § 1.1.

18. Oklahoma law further provides that county sheriffs may "appoint as many reserve force deputy sheriffs as are necessary to preserve the peace and dignity of the county." 19 Okla. Stat. § 547.  On information and belief, TCSO continuously maintained a Reserve Deputy Program during Sheriff Glanz's tenure.  TCSO's publicly accessible website describes the Reserve Deputy Program as follows:

The Tulsa County Sheriff's Office Reserve Deputy Program is a vital part of the Sheriff's Office. The purpose of the TCSO Reserve Deputy Program is to provide trained civilian volunteers to *augment* the manpower of the Sheriff's Office. Reserve deputies work in all areas of TCSO, as well as at many special events throughout the year. These dedicated reserve deputies work full time jobs in the community and volunteer their time in a myriad of events such as the *Special Olympics and Tulsa State Fair*.

The Reserve Deputy Program has allowed the Tulsa County Sheriff's Office

to build a better relationship with the community by allowing citizens to participate in the daily operations of the Sheriff's Office.

*See* http://www.tcso.org/tcsoweb/Reserves.aspx (emphasis added) (as of

December 11, 2015).

19. At all pertinent times, the Reserve Deputy Program was further defined, and governed, by TCSO policy, namely Chapter 16, Policy 4.  In pertinent part, the TCSO Reserve Deputy Program policy provides, or at all pertinent times, provided, as follows:

❖      "[R]eserve deputies will adhere to and be accountable for all Sheriffs Office policies, rules and regulations, standard operating procedures, and local, state and federal laws." Policy 16-4.1

❖      "Reserve deputies functioning in an official capacity will be under the direction and charge of the Sheriff and *will subordinate themselves* to the supervision of the Sheriffs Office during their tenure of service." *Id.*

❖      "The candidates for reserve deputy positions must meet the same selection criteria as full-time deputies." Policy 16-4.4-B.1.

❖      "Applicants accepted as candidates for the Tulsa County Reserve Deputy Program will complete the Reserve Law Enforcement Training Academy prescribed by C.L.E.E.T. consisting of 240 hours before being commissioned by the Sheriffs Office." Policy 16-4.4-C.1. [1]

❖      "Reserve deputies will wear the same uniform and *carry the same equipment* as the regular deputies with the exception that the reserve deputies will wear a badge with 'RESERVE' clearly marked." Policy 16-4.4-D.2.

❖      "All reserve deputies will be required to complete the two-hour mental health training annually." Policy 16-4.4-D.4.

❖      "All reserve deputies will be required to complete 23 hours of C.L.E.E.T. training and 2 hours of mental health training *each year.*" Policy 16-4.4-D.6.

---

[1]      "C.L.E.E.T." is an acronym for the Council on Law Enforcement, Education and Training.

❖ "Reserve deputies will be tested for firearms proficiency **at least annually** during firearms qualifications and adhere to the requirements and policies set forth in the Sheriffs Office policies and procedures." Policy 16-4.4-D.7.a.

❖ "Reserve deputies not completing C.L.E.E.T. mandated training of 23 hours continuing education, 2 hours mental health training and firearms qualification annually **will be placed on suspension."** Policy 16-4.4-D.8.

❖ *"Reserve deputies will abide by the same code of ethics and rules and regulations as regular deputies."* Policy 16-4.4-E.2.b.

(emphasis added).

20. At all pertinent times, TCSO Reserve Deputies were divided into five (5) classifications: (A) Limited Service Basic Classification; (B) Basic Classification; (C) Intermediate Classification; (D) Advanced Classification; and (E) Transportation Reserve Deputy. *See, e.g.* Policy 16-4.4.-F.

21. The Advanced Classification "is the only reserve deputy classification that may perform normal field duties by themselves and without the direct supervision of a certified deputy." Policy 16-4.4.F.4.d. With the additional powers come additional and distinct prerequisites. In this regard, Advanced Reserve Deputies must *"complete and document **480 hours** of the TCSO Field Training Officer program."* Policy 16-4.4.F.4.c (emphasis added).

22. These Reserve Deputy policies, which are designed to protect the public, were routinely and knowingly violated by Sheriff Glanz and TCSO for the benefit of Defendant Robert "Bob" Bates ("Bob Bates"). The knowing violation of these Reserve Deputy policies constitutes deliberate

indifference to the Fourth Amendment rights of the public, including Eric Harris.

23. Over the years, several of Sheriff Glanz's close friends served as Reserve Deputies. These include Bob Bates, County Assessor Ken Yazel and local attorney Reuben Davis.

**B. The Seeds of Undue Influence: Bob Bates' Personal Relationship with Sheriff Glanz and "Donations" to TCSO**

24. Bob Bates first became a TCSO Reserve Deputy in 2008. At the time, Bates was sixty-six (66) years old.

25. Sheriff Glanz's personal relationship with Bates began long before 2008.

26. According to Sheriff Glanz's own public statements, he has been friends with Bob Bates for approximately fifty (50) years. Bates is a wealthy insurance executive who has described his Reserve Deputy work as a "hobby".

27. Over the years, Sheriff Glanz has been on numerous vacations and trips with Bob Bates, including at least one trip to the Bahamas. Sheriff Glanz has stayed at Bates' home in Florida and goes fishing with Bates on a frequent basis.

28. In 2012, Bob Bates served as Chairman of Sheriff Glanz's Re-Election Committee. That same year, Bates donated $2,500 to Sheriff Glanz's campaign.

29. Over an extended period of time, TCSO has accepted many expensive gifts from Bob Bates. In 2009, Bates donated three (3) automobiles to TCSO's "Drug Task Force", two (2) Dodge Chargers and a Crown Victoria.

Additionally, Bates donated a computer for placement in one of the new cars and a $5,000 "forensic camera" and lens kit.

30. In 2010, TCSO accepted a 2007 Ford F-150 and a 2010 Chevy Tahoe from Bates. That same year, Bates donated a hand-held radio "to be used by the drug unit for surveillance work...."

31. In 2011, Bates donated a 1997 Toyota Avalon to TCSO for "use as an undercover car by the drug task force."

32. Bates has also donated multiple pistols, a "key fob" covert video recorder, covert video recorder Oakley glasses and a pepper ball gun.

33. Moreover, there is evidence that Bates has given expensive gifts and/or other benefits to former TCSO Undersheriff and Chief Deputy Tim Albin ("Albin") and former TCSO Major Tom Huckeby ("Huckeby"). Huckeby was Bates' supervisor on TCSO's Violent Crimes Task Force. On information and belief, Bates has assisted high ranking TCSO employees with the payment of their mortgages, permitting these high ranking employees to live well above their means.

## C. The Reserve Deputy Program, "Political Patronage" and a History of Problems

34. Several years before Bob Bates joined TCSO as a Reserve Deputy, another Reserve Deputy, and close friend of Sheriff Glanz's, found himself in embroiled in controversy.

35. As noted, County Assessor Ken Yazel, a friend of Sheriff Glanz, has served as a Reserve Deputy. As Sheriff Glanz has publicly admitted, he "helped" Yazel get elected as County Assessor. After Yazel was elected, he hired

10

Sheriff Glanz's wife. In turn, Sheriff Glanz later hired Yazel's wife. Though Yazel's spouse was hired as an entry level employee with TCSO, she was paid around two times (2X) what such entry level employees are to be paid pursuant to policy. Sheriff Glanz provided Yazel's wife with additional preferential treatment by waiving the educational requirements for her position.

36. Sheriff Glanz has also publicly admitted that he appointed supporters to assessor positions as a "political patronage". These appointments included *Bob Bates' daughter*, Reserve Deputy Reuben Davis and the wife and daughter of Clark Brewster (an attorney who represents Sheriff Glanz in multiple civil rights lawsuits and represents Bob Bates in criminal and civil cases). These "political patronage" positions pay upwards of $51,000 annually for as little as one (1) day of work per week. Glanz appointed these supporters to assessor positions despite the fact that he did not know what the job entails. It is unclear what, if any, role the County Assessor, Mr. Yazel, had in supervising Glanz's "political patronage" appointees.

37. In 2005, Yazel was involved in a shooting while on duty as a TCSO Reserve Deputy. At the time, Yazel was purportedly supporting a task force in the arrest of a man -- Danny Foutch -- in Okmulgee County on a Tulsa County warrant. Yazel was one of *six (6) Reserve Deputies* on the scene of this dangerous arrest. Though some of the facts surrounding the incident remain unresolved, there is no dispute that Yazel shot Foutch in the hip.

38. After the shooting, Okmulgee County Sheriff Eddy Rice disputed aspects of

11

the incident and questioned the conduct of the TCSO Reserve Deputies on the scene. Sheriff Rice specifically noted that there were two (2) other accidental shots fired during the incident -- in addition to the shot that injured Foutch -- which heightened the dangerousness of the situation and seemed to evince inadequate training of the Reserve Deputies. Based on these concerns, Sheriff Rice demanded an investigation into TCSO's Reserve Deputy Program.

39. Though the shooting was ostensibly "investigated" by TCSO, on information and belief, Foutch was never interviewed. Further, on information and belief, TCSO conducted no meaningful investigation of its Reserve Deputy Program in response to the incident. On information and belief, the crime scene was illegally manipulated and tampered with in an effort to secure a criminal conviction against Foutch. On information and belief, TCSO did not meaningfully change its Reserve Deputy Program in response to the shooting.

40. Yazel is currently on TCSO's active Reserve Deputy roster.

**D. Special Treatment, an Atmosphere of Intimidation and the Falsification of Training Records / The IA Investigation and Report**

41. As noted *supra*, Bob Bates joined TCSO's Reserve Deputy Program in 2008, at the age of sixty-six (66).

42. From the beginning of his tenure as a Reserve Deputy, it was clear that, contrary to TCSO's written policies, Bates would be given highly preferential treatment and would *not* "adhere to and be accountable for all [TCSO] policies, rules and regulations, standard operating procedures,

12

and local, state and federal laws." Policy 16-4.1.

43. In 2009, an internal affairs ("IA") investigation was conducted by TCSO concerning two issues: (1) whether Bates was "treated differently than other Reserve Deputies in the past..."; and (2) whether there was "any pressure exerted on any employees by [TCSO] supervisors to aid Reserve Deputy Bates in this regard." IA Report at 1.

44. However, upon the recommendation of former Undersheriff Brian Edwards, the Bates matter was not subjected to a "full" IA investigation. *See In re: Tulsa County Grand Jury*, GJ 2015-1 (Tulsa County Dist. Crt.), "Accusation for Removal of Sheriff Stanley Glanz", 9/30/15 at 1 (hereinafter referred to as "Grand Jury Report"). Further, Sheriff Glanz concurred with Undersheriff Edwards' "decision to refuse to initiate an official, numbered, Internal Affairs investigation" into Bob Bates' conduct. *Id.*

45. In any event, as documented in an August 12, 2009 Report ("IA Report), IA Investigator Rob Lillard found: "policy has been violated and continues to be violated by both Capt. Tom Huckeby and Chief Deputy Tim Albin with regard to special treatment shown to Reserve Deputy Robert Bates with regard to his field training" and that Albin had created "an atmosphere in which employees were intimidated to fail to adhere to policies in a manner which benefits Reserve Deputy Bates." *Id.* at 11.

46. The IA Report, including the attached evidentiary materials, contains disturbing details surrounding Bates' field training, or lack thereof.

47. As part of the IA investigation, Lillard interviewed Sergeant Randy

Chapman, who was, at pertinent times, TCSO's Reserve Deputy Coordinator. Chapman quickly noted several concerns about Reserve Deputy Bates. First, Bates was admitted to the Reserve Deputy Program without Chapman's knowledge. According to Chapman, as the Reserve Coordinator, he should have been notified of Bates' entry into the Program. Second, after Chapman explained the Program's rules to Bates, he learned that *"Bates was driving a personally owned car with police equipment prior to achieving the necessary level to do so."* Upon discovery of this, on December 17, 2008, Chapman wrote a memorandum to TCSO Captain Larry Merchant, characterizing TCSO's favoritism toward Bates as "deliberate indifference" and inquiring, *"[w]hat is the purpose of having policy if members of [TCSO] do not follow it and we as supervisors allow violations because of who the persons are?"* Third, Bates was performing traffic stops and operating in the field without direct supervision, in violation of Policy. As noted above, only *Advanced* Reserve Deputies, with at least 480 hours of field training, "may perform normal field duties by themselves and without the direct supervision of a certified deputy." Policy 16-4.4.F.4.d. After Bates expressed a desire to "stop vehicles and do patrol functions on his own", Chapman informed Bates that he would need to complete 480 hours of field training before he could operate in such a manner. Nevertheless, after this conversation with Bates, Chapman learned that Bates *"was out stopping vehicles on his own without completing the [field training] program."* When Chapman informed Bates that he could not

14

make stops prior completing the training, Bates replied, *"Well I can do it and if you don't like it you can talk to Tim Albin or Sheriff Glanz because I'm going to do it"*.

48. Chapman never received **any** documentation of Bates' field training.  In addition, Chapman was advised by at least two (2) other deputies that Bates' field operations were "a little scary".

49. After Chapman went to then-Chief Deputy Albin with his concerns about Bates, he received only harassment and retaliation in return. Albin stated to Chapman, "This is a shit sandwich and you'll just have to eat it but not acquire a taste for it."  At another point, Albin angrily stated, "I'm tired of you fucking with this guy [i.e., Bates] and I'm tired of your shit."  On another occasion, Albin yelled at Chapman, "Your [sic] dicking with Bates … you need to stop messing with him because he does a lot of good for the County."  Ultimately, Albin told Chapman *"not to have any contact or talk with Bates at all, removing him (Chapman) from supervising [Bates]."*

50. Having nowhere else to turn, ***Chapman met directly with Sheriff Glanz to bring all the mounting issues concerning Bates to the Sheriff's attention.***  After Chapman met with Glanz, *no corrective action* was taken.   Instead, Albin, in an obvious act of retaliation, "assigned [Chapman] to work a week of Midnight shift."  Chapman was subsequently removed, completely, from the Reserve Deputy Program and transferred to Special Services.  When Chapman asked why this transfer was being made, he was told, "Chief Albin does not want you to have any contact with Bob Bates anymore."  Sheriff Glanz told Chapman, that he

"had made Bob Bates mad and that Bates requested that Chapman be moved." Grand Jury Report at 2.

51. Chapman *met with Sheriff Glanz for a second time* to complain about the transfer from his position as Reserve Deputy Coordinator. However, yet again, Sheriff Glanz took no action. Chapman asked another supervisor, Captain Larry Merchant, if he could provide any assistance. Merchant replied that he could not do anything because "Bates has bought [then-Captain] Huckeby watches and takes [Albin and Huckeby] fishing and stuff." Chapman determined that "Albin and Huckeby had been bought off because *Bates can do whatever he wants and there has [sic] been no consequences."*

52. A Grand Jury, duly impaneled by the Tulsa County District Court, found Sheriff Glanz's "act of reprimanding Corporal Chapman and the reasons given by Sheriff Glanz for the reprimand was an act contrary to a known duty to follow Policy and/or was *inexcusably reckless in performing his duty to supervise and lead the Sheriff's Office."* Grand Jury Report at 2 (emphasis added).

53. Lillard also interviewed Sergeant Eric Kitch concerning Bob Bates. Kitch had supervisory authority over Bates. According to Kitch, upon Bates' hiring, he "did not complete an entry test or MMPI (mental evaluation) as stated by policy." This is confirmed by Bates' "Background Synopsis". Kitch was subsequently notified that Bates was operating as an Advanced Reserve, despite an apparent lack of training. Kitch specifically came to "doubt[] the training Bates received because there [were] *no records or*

*Daily Observation Reports."* In addition, Kitch learned that Bates had *"fail[ed] to meet firearms requirements."* Kitch never received any "documentation of Bates having received the required 480 hours of Field Training to achieve" Advanced Reserve status. Kitch documented these concerns in memoranda and voiced the concerns to TCSO supervisors. Yet again, no meaningful corrective action was taken. On the contrary, similar to the mistreatment encountered by Chapman, Kitch was chastised by Albin and relieved of any supervisory authority over Bates.

54. A letter written by TCSO Corporal Warren Crittenden on May 13, 2009, credited Bates with 328 training hours, though *only 72 hours of training* were documented. Crittenden was intimidated into signing off on Bates' field training though he knew the training was incomplete. According to the IA Report: "Crittenden was shown two memorandums apparently written by him in reference to Reserve Deputy Bates. He stated that *he did not write either of them*. ... He was given them by Captain Huckeby and told to initial them." (emphasis added). Crittenden further noted that Bates was in need of remedial training as he was not good at traffic stops and operations. Crittenden stated that Bates was ***not capable of functioning in the field.*** Yet, despite his inadequacies and lack of documented field training, Bates was permitted to operate in the field "as a normal field trained Deputy."

55. In addition to the statements from Chapman, there is other evidence in the IA investigation file that Sheriff Glanz had actual notice of serious concerns regarding Bates' lack of requisite training. Specifically, on

17

August 5, 2009, TCSO Deputy Bonnie Fiddler wrote a memorandum to Sheriff Glanz indicating that an in-service training certificate for Bates, which was signed by Sheriff Glanz and Albin, was falsified.

56. More generally, on July 1, 2009, Sheriff Glanz met with twenty (20) TCSO employees to discuss "concerns with illegal, unethical and unprofessional issues with [the] Services Division." In a follow-up email to Sheriff Glanz from Sergeant Chis Maxey, dated August 5, 2009, it was clarified that the concerns centered on Albin's intimidation tactics and misrepresentation of the TCSO Academy curriculum.

57. Despite these serious known concerns about Bates' lack of training and inadequate supervision, Sheriff Glanz took no discernable corrective action. Bates was permitted to continue operating as an Advanced Reserve Deputy, without the required training. In fact, Bates later went on to join the Drug Task Force and Violent Crimes Task Force, regularly and actively participating in highly dangerous arrests and other operations, in spite of his lack of training and advanced age. Sheriff Glanz removed Bates from the "normal chain of command" and placed "Bates under the direct supervision of" Huckeby and Albin. Grand Jury Report at 2.

58. The IA Report, documenting Lillard's findings concerning Bates, was submitted to then-Undersheriff Brian Edwards on August 12, 2009. TCSO's public statements about the IA Report have been inconsistent, false and misleading. Initially, TCSO denied that the IA Report existed. Later, Sheriff Glanz conceded that an investigation occurred, but TCSO claimed that the Report could not be located. After the IA Report was

released to the public, on April 24, 2015, Sheriff Glanz's spokesman claimed that Sheriff Glanz had never seen it before. **_Glanz later admitted that he had seen the IA Report, though he did not read it "word for word", around the time it was issued._** *See* Tulsa World TV Interview.

59. It is now known that after the IA Report was released to the public, Sheriff Glanz terminated two (2) employees he suspected were involved in "leaking" the IA Report. *See* Grand Jury Report at 4.   Glanz further admonished Huckeby to "keep [his] mouth shut" and issued a thinly-veiled threat, "[r]emember that your son still works for me." *Id.*

60. Sheriff Glanz further **_obstructed a subsequent IA investigation_** into his knowledge of the IA Report (involving Bates) by instructing former Undersheriff Edwards, a key witness, not to cooperate with the investigation (conducted by Chief Deputy John Bowman). *See* Grand Jury Report at 5.

61. "The only action taken as a result of the [IA] Report was to require Reserve Deputy Bates to donate the vehicle he had outfitted with lights and other police equipment to the Sheriff's office which was then assigned back to [Bates]." Grand Jury Report at 2. "No other action was taken to correct any conditions which caused this preferential treatment." *Id.* **_"Reserve Deputy Bates was not counseled or disciplined in any fashion and his duties and actions were not limited or curtailed in any way."_** *Id.* (emphasis added).

62. There is further evidence, going back to 2009, that Bob Bates posed a

19

known and substantial risk with respect to his firearm proficiency. In 2009, Bates participated in firearm qualification testing at the firing range under the supervision of Sergeant Kitch. During this time, Bates "was verbally reprimanded more than once for ***dangerous behavior with his weapon*** on the line, known as 'covering' the other participants by ***pointing his firearm*** in such a manner as to ***expose them to being shot.***" Grand Jury Report at 3 (emphasis added). After being reprimanded, Bates "became angry and refused to complete the firing range round, instead holstering his firearm and crossing his arms for the remainder of the course, resulting in a ***failing score.***" *Id.* (emphasis added). In response, Sheriff Glanz "verbally contacted Sgt. Kitch, telling [Kitch] to ***'take it easy'*** on Reserve Deputy Bates and further telling him to ***'pass him.'***" *Id.* (emphasis added). The Grand Jury concluded that Sheriff Glanz's acts in this regard evinced "Gross Partiality in Office." *Id.*

63. Sheriff Glanz was put on notice of additional evidence that Huckeby was harassing and intimidating TCSO employees and assaulting African-American inmates. In 2008, Sheriff Glanz pledged that he would investigate allegations from an African-American TCSO supervisor of harassment, intimidation, retaliation and a racially hostile working environment encouraged by Huckeby at the Jail. In 2010, a former TCSO employee at the Jail signed a sworn affidavit, which was filed in litigation against Sheriff Glanz, testifying to Huckeby's excessive use of force against African-American inmates and acts of intimidation against employees.

64. Huckeby was not disciplined for his known pattern of gross misconduct.

20

Neither Huckeby nor Albin were punished for their transgression in covering up and falsifying Bates' training records. There were no repercussions for Albin and Huckeby's intimidation of TCSO employees on Bates' behalf. On the contrary, both **Albin and Huckeby were** subsequently **promoted** (Albin to Undersheriff and Huckeby to Major).

65. In this sense, Glanz ratified Albin and Huckeby's decisions -- and the bases for them -- in their handling of Bob Bates.

66. In sum, Sheriff Glanz knew, at least by August 2009, that Bates had received special treatment, did not have the requisite training necessary to operate as an Advanced Reserve and was not being adequately supervised. Indeed, Sheriff Glanz actively participated in this preferential treatment. As the Grand Jury found, Sheriff Glanz instructed "full time deputies to refrain from enforcing the policies of Tulsa County Sheriff Office when it involved Reserve Deputies, thus establishing a clear pattern of behavior to excuse certain Reserve Deputies from the written policy requirements that even full time deputies were required to follow." Grand Jury Report at 3. Simply put, Sheriff Glanz knew that allowing Bates to operate as an Advanced Reserve Deputy posed an excessive and substantial risk that citizens' constitutional rights would be violated. Yet, Sheriff Glanz utterly disregarded these known and substantial risks.

### E. The Terry Byrum Incident

67. Thursday, February 12, 2015, began as a ordinary day for Terry Byrum ("Byrum"). At around 12:30 pm, Byrum, along with his girlfriend Heather and her friend, Jennifer, drove to the nearby Warehouse Market, located

around 6700 N. Peoria, to do some grocery shopping. At the time Byrum was driving Heather's white Ford Thunderbird.

68. As Byrum was standing in line at the grocery store, he looked out of the window and noticed a black Chevrolet Tahoe circling around his girlfriend's Thunderbird in the parking lot.

69. After Byrum purchased his groceries, he got in the Thunderbird and began driving back to the residence where he was staying at the time. He pulled into a local residential area and noticed a white marked Tulsa County Sheriff's Office ("TCSO") vehicle pursuing with its blue and red lights flashing. Byrum immediately pulled off of the street into a residential driveway and stopped the Thunderbird.

70. After stopping, Byrum, Heather and Jennifer were all ordered out of the car by TCSO Deputy Evan Foster. Byrum complied with the order and exited the vehicle. Shortly thereafter, the same black Tahoe he had seen earlier at the grocery store arrived at the stop. An older man, later identified as Defendant Bob Bates, exited the Tahoe and began speaking with Heather and Jennifer.

71. Immediately upon exiting the Thunderbird, Byrum was handcuffed and placed under arrest. Deputy Foster patted Byrum down, but found no contraband or weapons. When Byrum asked why he had been arrested, Deputy Foster stated, "you were driving with a suspended license." However, at this point, Byrum had not revealed that he was driving with a suspended license.

72. After handcuffing Byrum, Deputy Foster began walking Byrum to his

22

TCSO vehicle. Byrum saw that Heather and Jennifer were standing outside of the Thunderbird and speaking to Bob Bates. Byrum turned his head and asked Heather to make arrangements to have him bonded out of Jail.

73. After Byrum turned his head to talk to Heather, Deputy Foster forcefully took Byrum down onto the pavement. Byrum was surprised by this as he had not resisted arrest, attempted to flee or threatened Deputy Foster in any way.

74. After Deputy Foster forcibly took Byrum down to the pavement, he placed his knee into Byrum's back. At this time, Byrum was lying on his stomach, handcuffed, unarmed and not resisting. Nonetheless, a second officer, now known to be former Reserve Deputy Bob Bates, approached and placed his foot on the back of Byrum's head / upper neck. Byrum was completely subdued by the point. Still, one of the officers stated, "tase him", and Bates proceeded to administer his Taser on Byrum's leg. Byrum screamed out in pain. It felt like he had been electrocuted.

75. The force used by Bates was objectively unreasonable. Bates' use of a Taser on Byrum when he was handcuffed, on the ground and subdued was completely unnecessary. Because Byrum did not pose any immediate threat and was not actively resisting arrest, Bates had no reasonable basis to employ *any* force on Byrum. The use of a Taser under the circumstances constitutes clearly excessive use of force.

76. After Bates Tased Byrum, Bates and Foster stood Byrum up and he was transferred to TCSO headquarters for questioning. Byrum was

interrogated by TCSO Deputy Lance Ramsey.  Ramsey claimed that they served two search warrants and uncovered a meth lab and drugs at Byrum's purported residence.  Ramsey further stated, "we lost some dope, what happened to it?"  Byrum had, and to this day has, no idea what Ramsey was referring to.

77. While Byrum remains in custody on pre-existing "Light Horse Warrants", *he was never charged with any crime in connection with the February 12 arrest.*

78. On February 13, 2015, Deputy Foster drafted a probable cause affidavit in connection with Byrum's arrest.  The probable cause affidavit, which was never filed because the District Attorney declined to file charges, contains misinformation.  Notably, Foster asserts, "Deputy Bob Bates ... **had** to taser [Byrum] *to get him to comply* with verbal commands."  While it is true that Bates "taser[ed]" Byrum, it is untrue that Bates did so to get Byrum to comply.  Again, at the time of this use of force, Byrum was not resisting, was handcuffed and subdued.

79. No one from TCSO ever interviewed Byrum concerning Reserve Deputy Bates' use of force.  On information and belief, the use of force on Byrum was not investigated by TCSO.  On information and belief, Bates was not disciplined as a result of his excessive use of force on Byrum.   On information and belief, Bates was not provided any remedial training as a result of the use of force on Byrum.

80. Byrum has suffered injuries as a direct and proximate result of Bates' unreasonable   and   excessive   use   of   force,   and   Sheriff   Glanz's

unconstitutional failure to train and failure to supervise Bates.

**F. The Eric Harris Incident**

81. On April 2, 2015, TCSO's Violent Crimes Task Force was involved in a sting operation targeting Eric Harris.  Specifically, an undercover officer had arranged to purchase a firearm from Mr. Harris in the parking lot of a Dollar General store in North Tulsa.  Remarkably, the Violent Crimes Task Force[2] chose to conduct this ostensibly dangerous sting operation in close proximity to Celia Clinton Elementary School, while children were outside on the playground.  No one from TCSO provided any advance notice of the sting operation to Celia Clinton Elementary School or Tulsa Public Schools, needlessly placing these young children in danger.

82. A "key fob" covert camera -- which, ironically enough, was donated to TCSO by Bates -- captured the first part of what would quickly become a tragic disaster.  In the initial discussion between Mr. Harris and the undercover deputy, Mr. Harris indicates that he had brought a gun -- in a backpack -- to sell to the undercover officer.  Importantly, Mr. Harris made it clear that this single firearm, a 9 millimeter Luger, was the ***only*** firearm he had in his possession.  Mr. Harris can then be seen pulling the handgun out of a backpack and handing it to the undercover deputy.

83. After the gun was no longer in Mr. Harris' possession, an unmarked car sped into the parking lot and abruptly stopped next to the undercover

---

[2]    There is also evidence that, at the urging of Bates, the Violent Crimes Task Force, including Huckeby, improperly and improperly assisted the law firm of Brewster & DeAngelis in gaining an unfair advantage in unrelated domestic litigation.

deputy's truck.  Realizing that he had been tricked and that an arrest was likely imminent, Harris exited the truck and began to run north up a sidewalk and into the street.  A second TCSO Deputy, Defendant Ricardo Vaca ("Vaca") pursued Mr. Harris, first in his vehicle, and then on foot.  Though Vaca had less than one (1) year of experience as a TCSO Deputy at the time of the incident, he was already a member of the "elite" Violent Crimes Task Force.  Sheriff Glanz has since publicly stated that a deputy with such minimal experience should not have been assigned to the Violent Crimes Task Force.

84. At the time of the pursuit, Vaca happened to be wearing covert video recorder glasses, which recorded a portion of the incident.  Mr. Harris ran down the street, at a jogger's pace, for a short period of time.  Mr. Harris was wearing a t-shirt and gym shorts, and was clearly unarmed.  Vaca, who on information and belief is highly trained and skilled in martial arts, tackled Mr. Harris and quickly brought him down to the ground.

85. According to Bates' own written statement, he had driven to the location of the Dollar Store parking lot a short time after he heard that the "arrest team was moving in."  With so many other deputies involved in the arrest - - including Vaca, Defendant Michael Huckeby ("M. Huckeby"), Defendant Joseph Byars ("Byars"), Evan Foster ("Foster"), Layman Boyd ("Boyd"), Lance Ramsey ("Ramsey") and Miranda Munson ("Munson") -- it is unclear why Bates, an undertrained 73-year-old Reserve Deputy, was deployed to the scene to begin with.  In any event, Bates claims that he saw Vaca pursuing Mr. Harris, "grabbed [his] pepper ball launcher" and got

out of his vehicle "[n]ot knowing whether the suspect would be caught by Vaca...."

86. By the time Bates walked up to the location where Vaca had tackled Harris, four (4) other deputies, M. Huckeby, Byars, Foster and Layman, had already arrived to assist. On information and belief, at least two (2) of these deputies, and perhaps all four (4), were physically holding Mr. Harris down on the pavement. Indeed, Foster was standing on Mr. Harris' legs, making it impossible for him to flee or actively resist.

87. Bates asserts in his written statement that when he walked up to the scene, he "drew what [he] thought was [his] TASER" with the intent of discharging the Taser into Mr. Harris' right shoulder. However, video of the incident proves that: (A) Bates is lying; or (B) Bates' purported "belief" that he drew his Taser was objectively unreasonable. As the video plainly shows, Bates' Taser, which is bright fluorescent yellow, was, at all times, securely fastened to the front-upper-left side of his TCSO-issued protective vest. By contrast, TCSO deputies secure their firearms on the right hip, an obviously and distinctly different location than the front-upper-left side of a protective vest. In fact, Mr. Bates stated, and demonstrated, during a nationally-televised interview with the Today Show, that he routinely keeps his Taser on the front-upper-left side of his protective vest, while keeping his firearm on his right hip toward the back.

88. Nonetheless, even accepting Bates' statements as true, Bates did *not* draw his Taser from the front-upper-left side of his protective vest. Rather, according to Bates' own statement, *he drew a Smith & Wesson .357*

**revolver from a holster on his right hip.**  The .357 revolver was Bates' own personal firearm.   It was not issued to him by TCSO. Consistent with Sheriff Glanz/TCSO's failure to train and supervise Bates, and in violation of TCSO Policy, Bates was never trained or certified to use the .357 revolver as his service weapon.

89. Indeed, the Grand Jury found that "Reserve Deputy Bates was **permitted** by [TCSO] to wear and utilize firearms not approved for use by the Sheriff['s] Office in **violation of TCSO policy."** Grand Jury Report at 3 (emphasis added).

90. The Smith & Wesson .357 revolver was not on the list of approved firearms deputies can carry on duty. *See, e.g.,* Grand Jury Report at 3.

91. The appearance of Bates' .357 revolver is vastly different than the appearance of his Taser.   While the .357 is dark grey and metallic, the Taser is bright yellow and plastic.   In addition, the grips on the two weapons are different.

92. When one considers the differences between the location, appearance and feel of the two weapons, no reasonable officer could have mistaken the .357 for a Taser.

93. Contrary to Bates' statement that he "drew" the .357 revolver after exiting his vehicle, statements from former TCSO Detective Billy McKelvey indicate that Bates grabbed the gun from his truck and had it in his right hand from the moment he left his vehicle.

94. Accepting Bates' version of events, after Bates drew his .357 revolver, **he shot Mr. Harris, at close range, in the back, under his right**

*arm.* Under McKelvey's version of events, Bates did not "draw" the .357, but shot Mr. Harris with the .357 already in his hand as he approached Harris on foot. Under *either* scenario, Bates' use of force was excessive and objectively unreasonable.

95. The circumstantial evidence in this case indicates that ***Bates did not mistake his .357 revolver for his Taser.*** In the alternative, if the evidence ultimately establishes that Bates truly mistook his gun for his Taser, such mistake was objectively unreasonable.

96. The use of the unapproved .357 revolver, which Bates was not trained or certified to use as his service weapon, was objectively unreasonable and excessive under the circumstances. Specifically, at the time of the shooting, Harris was unarmed, not fleeing and had been subdued by the other deputies on the scene. In fact, because Bates did not have the requisite training or certification to use the .357 revolver, it would have been objectively unreasonable for Bates to discharge the weapon under *any* circumstances.

97. Moreover, even if Bates had used his Taser, as was his claimed intent, the use of a Taser under the circumstances would have been objectively unreasonable and excessive.

98. The sound of the gunshot can be clearly heard from the audio picked up by Vaca's video recorder glasses. After Harris was shot, he repeatedly told the deputies he had been shot -- yelling, "He shot me!" -- and blood could be seen trickling down his right arm. Bates can be heard on the video saying he had shot Harris, stating: "Oh, I shot him. I'm sorry." Harris can be

heard saying, "I'm losing my breath," to which a Byars callously replies, ***"Fuck your breath!"***

99. M. Huckeby is shown in the video kneeling on Harris' head, with all of his weight, as one of the deputies yells at Harris, "You shouldn't have ran," and "Shut the fuck up."

100.    The force used by M. Huckeby in kneeling on Mr. Harris' head, after he had been subdued and shot in the back by Bates, was objectively unreasonable and excessive. While Sheriff Glanz has publicly attempted to defend M. Huckeby's use of force by stating "that's simply a tactical move that controls that person when they're down," (See Pat Campbell Interview), the Director of CLEET would disagree. In a story posted to radio station KFAQ's website, CLEET Director Steve Emmons is quoted as saying, that CLEET trainers ***"never teach anything with the head or the neck as a control point*** ... [i]t's all done with the shoulder and the upper back." (emphasis added).

101.    Bates, Vaca, M. Huckeby and Byars were all deliberately indifferent to Mr. Harris', obvious, known and serious medical needs. These deputies wasted valuable time in getting Harris the emergency medical treatment he obviously needed after being shot. Rather than assure that Harris received timely medical attention for his life-threatening injuries, Byars screamed and cursed at Harris as he was rapidly approaching death in the street. M. Huckeby forcefully grinded Harris' head into the concrete with his knee while he was in need of emergency medical attention.

102.    Neither M. Huckeby nor Byars was disciplined for their heinous

misconduct.  M. Huckeby was not properly trained in the use of force in deliberate indifference to the strong likelihood of constitutional violations.

103.     Indeed, M. Huckeby and Vaca should not have been involved in the arrest to begin with.  While both M. Huckeby and Vaca were being paid out of the Sheriff's Jail operations fund, they were improperly serving in the field with the Violent Crimes Task Force.  In addition, while on the Task Force, M. Huckeby was being supervised by his father, Tom Huckeby. Sheriff Glanz has publicly admitted that this was improper.  Additionally, neither M. Huckeby nor Vaca had sufficient time working in the field to be assigned to the Violent Crimes Task Force.

104.     At approximately 10:13 am, Emergency Medical Services Authority ("EMSA") was called.   EMSA arrived at the scene at approximately 10:20am, and found Mr. Harris lying in the street in shackles.  EMSA personnel noted that Harris had a "gunshot wound to the right armpit that had blood oozing from" it; Mr. Harris became "unresponsive, pulseless". First responders attempted to revive Mr. Harris to no avail.

105.     Mr. Harris was transported to St. Johns Hospital, where additional attempts at resuscitation were unsuccessful.  Harris was pronounced dead at 11:06 am.

106.     The Medical Examiner determined the cause of death to be a "gunshot wound to the right axilla".

107.     Mr. Harris died as proximate result of Bates' unreasonable and excessive use of force, and Sheriff Glanz's unconstitutional failure to train and failure to supervise Bates.

108.     Mr. Harris was injured as a proximate result of M. Huckeby's unreasonable and excessive use of force, and Sheriff Glanz's unconstitutional failure to train and failure to supervise M. Huckeby.

109.     Mr. Harris suffered injuries as a proximate result of Bates, Vaca, M. Huckeby and Byars' deliberately indifference to Mr. Harris, obvious, known and serious medical needs.

110.     After the shooting, Huckeby concealed and / or destroyed pertinent evidence.  Specifically, Huckeby downloaded video of the incident to a hard drive and the hard drive subsequently "disappeared".  Further, on information and belief, the Tulsa County District Attorney's Office has knowledge that Huckeby concealed and / or destroyed this evidence, but, as of yet, has taken no action to recover the video evidence or charge Huckeby with any crime.

111.     Overall, Sheriff Glanz and TCSO provided highly preferential treatment to Bates by knowingly failing to enforce their own Reserve Deputy Policies, training and supervision requirements for the benefit of Bates.  Glanz knew that Bates posed a specific risk and was dangerously deficient, in the handling of a firearm.  Glanz sought to cover these dangerous deficiencies up for the benefit of his friend and benefactor, Bob Bates.

112.     In utter disregard for the known, obvious and substantial risks to the public, Glanz and TCSO permitted Bates to repeatedly participate in highly dangerous law enforcement operations, without the necessary supervision, training or certification.  In essence, Bob Bates was not

32

adequately trained, Sheriff Glanz/TCSO acted to cover this up, and Sheriff Glanz/TCSO knowingly and recklessly allowed an undertrained and under-qualified 73-year old insurance executive to play cop. Eric Harris died as a result.

## CAUSES OF ACTION

### EXCESSIVE USE OF FORCE
### (Fourth Amendment; 42 U.S.C. § 1983)
### (Bates, M. Huckeby, Glanz (supervisory liability)
### and Weigel (official capacity))

113.    Paragraphs 1-112 are incorporated herein by reference.

114.    At the time of the complained of events, Mr. Harris, as a free person, had a clearly established constitutional right under the Fourth Amendment to be secure in his person and free from unreasonable seizure through objectively unreasonable excessive force to injure him and his bodily integrity.

115.    Any reasonable police officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

116.    In the totality of the circumstances, at the time that deadly force was used by Bob Bates, Mr. Harris was unarmed, had been subdued by as many as four (4) deputies, and thus, posed no immediate threat, was not actively resisting and was no longer attempting to evade TCSO by flight.

117.    The use of deadly force by Bates under such circumstances was excessive and objectively unreasonable.

118.    In fact, because Bates did not have the requisite training or

certification to use the .357 revolver, it would have been objectively unreasonable for Bates to discharge the weapon under *any* circumstances.

119.     Moreover, because Bates did not have the minimum training, and knew that he did not have the minimum training, to act as an Advanced Reserve, it was objectively unreasonable for Bates to operate in the field *at all*, rendering *any* use of force excessive.

120.     Furthermore, as shown *supra*, the circumstantial evidence in this case indicates that ***Bates did <u>not</u> mistake his .357 revolver for his Taser.***

121.     Even accepting the claim that Bates mistakenly drew, or grabbed, his .357 revolver, believing it to be his Taser, such mistake was objectively unreasonable.

122.     Further, even if Bates had deployed his Taser instead of his .357 revolver, such use of force would have been excessive and objectively unreasonable under the circumstances.

123.     The force used by M. Huckeby in kneeling on Mr. Harris' head, after he had been subdued and shot in the back by Bates, was objectively unreasonable and excessive, contrary to training and established standards of law enforcement practice.

124.     Bates and M. Huckeby seized Mr. Harris by means of objectively unreasonable, excessive physical force, thereby unreasonably restraining Mr. Harris of his freedom and causing him very serious and multiple bodily injuries, as well as mental pain and anguish.

125.    The use of force, as described herein, also involved reckless, callous, and deliberate indifference to Mr. Harris' federally protected rights.

126.    As a direct proximate result of Bates' unlawful conduct, Mr. Harris suffered actual physical injuries (including death), mental and physical pain and suffering and other damages and losses as described herein entitling Ms. Burke to recover compensatory and special damages on behalf of Mr. Harris' Estate, in amounts to be determined at trial.

127.    As a direct proximate result of M. Huckeby's unlawful conduct, Mr. Harris suffered actual physical injuries, mental and physical pain and suffering and other damages and losses as described herein entitling Ms. Burke to recover compensatory and special damages on behalf of Mr. Harris' Estate, in amounts to be determined at trial.

128.    As a further result of the Defendants' unlawful conduct, Ms. Burke is entitled to recover special damages, including medically related and funeral expenses, in amounts to be established at trial.

129.    Ms. Burke is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and omissions alleged herein constitute reckless or callous indifference to Mr. Harris' federally protected rights.

### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
#### (Fourteenth Amendment; 42 U.S.C. § 1983)
#### (Bates, M. Huckeby, Byars, Vaca,
#### Glanz (supervisory liability) and Weigel (official capacity))

130.    Paragraphs 1-129 are incorporated herein by reference.

131.    It is well-established that arresting police officers may be held liable

for being deliberately indifferent to an arrestee's serious medical needs. *See, e.g., Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1315-17 (10th Cir. 2002); *Garcia v. Salt Lake County,* 768 F.2d 303 (10th Cir.1985); *Prado v. Lane,* 98 F. App'x 757, 759-60 (10th Cir. 2004).

132.    As described *supra,* Bates, Vaca, M. Huckeby and Byars were all deliberately indifferent to Mr. Harris' obvious, known and serious medical needs.    These deputies wasted valuable time in getting Harris the emergency medical treatment he obviously needed after being shot. Rather than assure that Harris received timely medical attention for his life-threatening injuries, Byars screamed and cursed at Harris as he was rapidly approaching death in the street.    M. Huckeby forcefully grinded Harris' head into the concrete with his knee while he was in need of emergency medical attention. Bates did nothing to assist Mr. Harris.

133.    These Defendants exacerbated Mr. Harris' injuries and pain and suffering in deliberate indifference to his serious and emergent medical needs.

134.    As a direct proximate result of these Defendants' deliberate indifference, Mr. Harris unnecessarily suffered prolonged exacerbated mental and physical pain and suffering and other damages and losses as described herein entitling Ms. Burke to recover compensatory and special damages on behalf of Mr. Harris' Estate, in amounts to be determined at trial.

135.    Ms. Burke is entitled to punitive damages on her claims brought pursuant to 42 U.S.C. § 1983 as Defendants' conduct, acts and omissions

alleged herein constitute reckless or callous indifference to Mr. Harris' federally protected rights.

### SUPERVISOR LIABILITY/OFFICIAL CAPACITY LIABILITY (42 U.S.C. § 1983) (Sheriff Glanz and Acting Sheriff Weigel)

136.    Paragraphs 1-135 are incorporated herein by reference.

137.    There is an affirmative link between the aforementioned excessive force utilized by Bates and M. Huckeby and policies, practices and/or customs which Defendant Sheriff Stanley Glanz promulgated, created, implemented and/or possessed responsibility for.  Acting Sheriff Weigel is liable, purely in his official capacity, as Sheriff Glanz's successor.

138.    Defendant Glanz knew and/or it was obvious that the maintenance of the aforementioned policies, practices and/or customs posed an excessive risk to the health and safety of citizens like Mr. Harris.

139.    Defendant Glanz disregarded the known and/or obvious risks to the health and safety of citizens like Mr. Harris.

140.    *First*, Sheriff Glanz utterly failed to properly train Bates and M. Huckeby.  As set forth *supra*, the training was in fact inadequate, and: (A) Bates and M. Huckeby exceeded constitutional limitations on the use of force; (B) the use of force arose under circumstances that constitute a usual and recurring situation with which deputies, particularly deputies on the Violent Crimes Task Force, must deal; (C) the inadequate training demonstrates a deliberate indifference on the part of Sheriff Glanz toward persons with whom the deputies come into contact, and (D) there is a direct causal link between the constitutional deprivation and the

37

inadequate training.

141.     Second, Sheriff Glanz failed to adequately supervise Bates and M. Huckeby.  As set forth, Sheriff Glanz utterly failed to assure that Bates and M. Huckeby were properly and adequately supervised, despite their known lack of training and enhanced risks they posed to the public, which amounts to deliberate indifference to the federal rights of persons with whom the TCSO deputies come into contact.  Further, there is a direct causal link between the constitutional deprivation and the inadequate supervision.

142.     Third, by the time that Mr. Harris was shot dead in the street, there was an established and unabated custom of excessive use of force by TCSO Reserve Deputies.  These prior instances of excessive force put Sheriff Glanz on notice that the Reserve Deputies, including Bates, were inadequately trained and/or supervised with respect to the use of force. Sheriff Glanz knew that there were serious deficiencies with the Reserve Deputy Program that created excessive risks, but he failed to alleviate those risks.

143.     Fourth, Sheriff Glanz knowingly failed to enforce policies necessary to the safety of citizens like Mr. Harris in deliberate indifference to their constitutional rights.  More particularly, as summarized *supra,* Sheriff Glanz was notified that the TCSO Reserve Deputy Program policies with respect to field training, firearm certification and supervision were being violated to benefit Bates.  The obvious purpose behind these policies is to ensure that Reserve Deputies, like Bates, have all the needed training,

38

certifications and supervision so that citizens who encounter Reserve Deputies are not placed in enhanced danger that their constitutional rights will be violated.  Sheriff Glanz disregarded these risks by knowingly failing to enforce TCSO Reserve Deputy Policies, training and supervision requirements for the benefit of Bates.  In utter disregard for the known, obvious and substantial risks to the public, Glanz and TCSO permitted Bates to repeatedly participate in highly dangerous law enforcement operations, without the necessary supervision, training or certification. This failure to enforce policy was a proximate cause of Mr. Harris' death.

144.    <u>Fifth</u>, Sheriff Glanz ratified the decisions—and the basis for them— of subordinates to whom authority was delegated subject to his review and approval.  More particularly, after receiving notice that Huckeby and Albin covered up Bates' lack of required training and supervision and intimidated and retaliated against TCSO employees on Bates' behalf, Glanz took no corrective action. On the contrary, both ***Albin and Huckeby were*** subsequently ***promoted*** (Albin to Undersheriff and Huckeby to Major).  The evidence establishes that Glanz specifically approved of and ratified Albin and Huckeby's decisions -- and the bases for them -- in their handling of Bob Bates in deliberate indifference to the constitutional violations that were likely to result.

145.    Acting Sheriff Weigel is liable for these unconstitutional policies and customs, purely in his official capacity, as Sheriff Glanz's successor.

146.    There is an affirmative link between the unconstitutional acts of his subordinates and Defendant Glanz's adoption and/or maintenance of the

39

aforementioned policies, practices and/or customs.

147.     As a direct and proximate result of the aforementioned policies, practices and/or customs, Mr. Harris suffered the injuries, including death, and damages as alleged herein.

148.     Ms. Burke is entitled to punitive damages on her claims brought against Sheriff Glanz in his individual capacity as his conduct, acts and omissions alleged herein constitute reckless or callous indifference to Mr. Harris' federally protected rights.

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant her the relief sought, including but not limited to actual and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN, SMOLEN & ROYTMAN, PLLC**

Daniel E. Smolen, OBA #19943
Donald E. Smolen, II, OBA #19944
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

*Attorneys for Plaintiff*