# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ROBBIE EMERY BURKE, | ) |
| Plaintiff, | ) |
| | ) Case No. 16-CV-7-JED-FHM |
| v. | ) |
| STANLEY GLANZ, et al. | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court are dismissal motions by the defendants, Stanley Glanz (Doc. 10), Michael Huckeby, Joseph Byars, and Ricardo Vaca (Doc. 11), Tulsa County Sheriff Vic Regalado (Doc. 12), and Robert C. Bates (Doc. 24). Sheriff Regalado is sued in his official capacity, while all other defendants are sued in their individual capacities.

## I. The Complaint

The following is a summary of plaintiff's factual allegations, which are contained in the plaintiff's Complaint (Doc. 2) and must be taken as true at the dismissal stage.

Plaintiff brings this action as the Special Administratrix of the Estate of Eric Harris. Mr. Harris died on April 2, 2015 as a proximate result of the use of deadly force by former Tulsa County Sheriff's Office (TCSO) Reserve Deputy Robert C. Bates. Defendant Bates shot Mr. Harris in the back during the course of an ostensibly dangerous undercover sting operation conducted by the TCSO's Violent Crimes Task Force. An undercover officer had arranged to purchase a firearm from Harris in the parking lot of a store in Tulsa. The first part of the sting was captured on a covert camera, inside a truck. Harris indicated that he had brought a gun in a backpack to sell to the undercover officer, and he indicated that it was the only firearm in his possession. Harris pulled the handgun out of the backpack and handed it to the undercover deputy.

After the gun was handed to the deputy, an unmarked car sped into the parking lot and stopped next to the truck. Harris exited the truck and ran north up a sidewalk and into the street. Another TCSO Deputy, defendant Ricardo Vaca, pursued Harris. Vaca was wearing covert video recorder glasses, which recorded part of the scene. Harris, who was wearing a t-shirt and gym shorts, ran for a short time, until he was tackled by Vaca and quickly brought to the ground.

Bates had driven to the location of the store parking lot where the sting was to occur, after he heard that the arrest team was moving in. Bates claimed that he saw Vaca pursuing Harris, Bates then "grabbed [his] pepper ball launcher" and got out of his vehicle, "[n]ot knowing whether the suspect would be caught by Vaca." Before Bates walked up to the location where Vaca had tackled Harris and taken him to the ground, four other deputies – Michael Huckeby, Byars, Foster, and Layman – had already arrived to assist. At least two, and as many as four, of the deputies were physically holding Harris down on the pavement. Deputy Foster was standing on Harris's legs, making it impossible for him to flee or actively resist. Bates then used his personal Smith & Wesson .357 revolver to shoot Harris, in the back, at close range, while Harris was unarmed, not fleeing arrest, and had been subdued by two to four other deputies.

Following the shooting, Bates asserted in a written statement that, when he arrived at the scene, he "drew what [he] thought was [his] TASER" with the intent of discharging it into Harris's right shoulder. Plaintiff alleges that this is either a lie or an objectively unreasonable belief, in light of the fact that his bright fluorescent yellow Taser remained securely fastened to the front upper-left side of his protective vest, while his dark grey, metallic firearm was on his right hip toward the back, and the weapons have different grips.

From a video recording of the incident, after Harris was shot, he can be heard repeatedly telling the deputies he had been shot, and blood trickled down his right arm. Bates also stated that

2

he had shot Harris. Harris then reported that he was "losing [his] breath," to which Deputy Byars replied, "Fuck your breath." Defendant Michael Huckeby is shown in the video kneeling on Harris's head with all of his weight, as another deputy yells at Harris, "You shouldn't have ran" [sic] and "Shut the fuck up." According to plaintiff, the force used by Michael Huckeby in kneeling on Mr. Harris's head, after he had been subdued and shot in the back, was objectively unreasonable and excessive. Bates, Vaca, Michael Huckeby, and Byars wasted valuable time in getting Harris emergency medical treatment he obviously needed after being shot. Rather than assure that Harris received timely medical attention for his life-threatening injuries, Byars screamed and cursed at Harris, and Huckeby forcefully grinded his head into the concrete. Plaintiff asserts that this conduct and the delay in medical treatment constituted deliberate indifference to Harris's obvious, known, and serious medical needs. Harris was subsequently pronounced dead.

Plaintiff further alleges that: Harris died as the proximate result of Bates's unreasonable and excessive use of force and Glanz's failure to train and supervise Bates; Harris was injured as a proximate result of Michael Huckeby's unreasonable and excessive use of force and Glanz's failure to train and supervise him; and Harris suffered injuries as a result of deliberate indifference of Bates, Vaca, Huckeby and Byars to Harris's obvious, known, and serious medical needs.

Bates was a 73-year-old insurance executive moonlighting as a Reserve Deputy. He lacked the requisite training, by hundreds of hours, to participate in such a field operation, and he was not certified to carry the .357 revolver, which was his personal firearm, as his service weapon. TCSO officials permitted Bates to wear and utilize firearms not approved for use by the TCSO, notwithstanding policy to the contrary.

Bates is a longtime friend and financial supporter of defendant Stanley Glanz, who is the former Sheriff. Long before Harris was killed, Glanz knew that Bates did not have the necessary

training or certifications to engage in TCSO's field operations and that Bates was not proficient with a firearm and posed a significant risk to the public. Plaintiff further alleges that Glanz ignored those dangers in order to allow his friend and financial benefactor to "play cop" in Tulsa County, and Harris died as a direct consequence.

During Glanz's tenure as Sheriff, TCSO maintained a Reserve Deputy Program, which the TCSO described in part as "provid[ing] trained civilian volunteers to augment the manpower of the Sheriff's Office." The Reserve Deputy Program was to be governed by TCSO policies, which required among other things that Reserve Deputies: adhere to all TCSO policies, local, state, and federal laws; subordinate themselves to the supervision of the TCSO; meet the same selection criteria as full-time deputies; complete the CLEET Reserve Law Enforcement Training Academy consisting of 240 hours; carry the same equipment as the regular deputies; complete 23 hours of CLEET training and 2 hours of mental health training each year; be tested for firearms proficiency at least annually; and abide by the same code of ethics and rules and regulations as regular deputies. In addition, only Reserve Deputies who were also in the Advanced Classification were authorized to perform normal field duties by themselves and without the direct supervision of a certified deputy, and Reserve Deputies in that category were required to complete 480 hours of the TCSO Field Training Officer program. Plaintiff alleges that these policies, which were designed to protect the public, were routinely and knowingly violated by Glanz and TCSO for the benefit of Mr. Bates, constituting deliberate indifference to the Fourth Amendment rights of the public, including Mr. Harris.

Following a decades-long personal relationship with Glanz, Bates became a Reserve Deputy in 2008. Glanz and Bates took vacations and trips together, Glanz visited Bates's Florida home, and the two frequently fished together. Bates served as Chairman of Glanz's 2012 Re-

Election Committee and donated $2500 to the campaign. Between 2009 and 2012, Bates also donated several automobiles, a $5000 forensic camera and lens kit, multiple pistols, covert video recorders, and a pepper ball gun to the TCSO. Bates also gave expensive gifts to the former Undersheriff and Chief Deputy Tim Albin and former TCSO Major Tom Huckeby. Huckeby was the supervisor of Bates on the Violent Crimes Task Force. In 2010, TCSO accepted a Ford F-150 and a Chevy Tahoe from Bates, and Bates donated a hand-held radio for surveillance work in the drug unit.

From the beginning of Bates's tenure as a Reserve Deputy, it was clear that, contrary to TCSO policies, Bates was given highly preferential treatment and would not be required to adhere to TCSO policies. Years before the shooting of Harris, an internal affairs investigation was conducted at TCSO concerning whether Bates was treated differently from other Reserve Deputies. The internal affairs investigator documented several serious problems with respect to Bates in an August 12, 2009 Report. Those problems related to the following:

- "policy has been violated and continues to be violated by both Capt. Tom Huckeby and Chief Deputy Tim Albin with regard to special treatment shown to Reserve Deputy Robert Bates with regard to field training" and Albin created "an atmosphere in which employees were intimidated to fail to adhere to policies in a manner which benefits Reserve Deputy Bates";
- TCSO Reserve Deputy Coordinator, Randy Chapman, expressed several concerns about Bates, including the following: (1) Bates was admitted to the Reserve Deputy program without the Coordinator's knowledge, (2) Bates was driving a personally owned car with police equipment prior to achieving the necessary position to do so, which had been the subject of a memo from Chapman characterizing TSCO's

favoritism toward Bates as "deliberate indifference," (3) Bates was performing traffic stops and operating in the field without direct supervision, in violation of policy, because Bates had not completed the requisite 480 hours of field training, and (4) When Chapman informed Bates that he could not make stops prior to completing the training, Bates replied, "Well I can do it and if you don't like it you can talk to Tim Albin or Sheriff Glanz because I'm going to do it."

- Chapman had not received any documentation of Bates's field training, and at least two other deputies had advised Chapman that Bates's field operations were "a little scary."

- After Chapman reported his concerns to Undersheriff Albin, Albin responded, "This is a shit sandwich and you'll just have to eat it but not acquire a taste for it." Chapman was also directed to cease all communications with Bates, and Chapman was removed from supervising him.

- Chapman met directly with Glanz to bring the concerns about Bates to Glanz's attention. Despite the meeting, no corrective action was taken. Instead, Chapman was assigned a work of week on the midnight shift in retaliation for reporting his concerns about Bates. Chapman was later removed entirely from the Reserve Deputy program and transferred to Special Services, and he was informed that the reason for the transfer was that he was not to have contact with Bates anymore. Glanz told Chapman that he had made Bates mad and that Bates had requested Chapman's removal.

- Sergeant Eric Kitch, who had supervisory authority over Bates, reported that Bates did not complete an entry test or MMPI, contrary to policy. Kitch was notified that Bates was operating as an Advanced Reserve, despite an apparent lack of training, and Kitch was doubtful of Bates's training because there were no records or Daily Observation

6

- Reports. Kitch also learned that Bates failed to meet firearms requirements, and Kitch never received any documentation of Bates having received the required 480 hours of Field Training to achieve Advanced Reserve status. Kitch documented those concerns in memoranda and voiced them to TCSO supervisors, but no meaningful corrective action was taken. Like Chapman, Kitch was relieved of any supervisory authority over Bates after Kitch reported his concerns.

- TCSO Corporal Warren Crittenden credited Bates with 328 training hours, but only 72 hours of training had been documented. Crittenden was intimidated into signing off on Bates's field training though he knew the training was incomplete. "Crittenden was shown two memorandums apparently written by him in reference to Reserve Deputy Bates. He stated that he did not write either of them. . . . He was given them by Captain Huckeby and told to initial them." Crittenden further noted that Bates was in need of remedial training as he was not good at traffic stops and operations, and Crittenden reported that Bates was not capable of functioning in the field. Notwithstanding these problems, Bates was permitted to operate in the field as a normal field trained Deputy.

- On August 5, 2009 TCSO Deputy Bonnie Fiddler wrote a memo to Glanz, indicating that an in-service training certificate for Bates, which was signed by Sheriff Glanz and Albin, was falsified.

- Despite serious known concerns about Bates's lack of training and inadequate supervision, Glanz took no discernable corrective action, and Bates was permitted to continue operating as an Advanced Reserve Deputy without the required training. Bates later joined the Drug Task Force and Violent Crimes Task Force and regularly and actively participated in highly dangerous arrests and other operations, despite his

lack of training. Glanz removed Bates from the "normal chain of command" and placed "Bates under the direct supervision of" Huckeby and Albin.

Following the shooting of Eric Harris, Glanz conceded that an investigation regarding Bates had occurred, but claimed that the report of the investigation could not be located. After the Report was released to the public, Glanz subsequently asserted that he had seen it around the time it was issued in August 2009, but that he had not read it "word for word." Glanz subsequently terminated two employees he suspected may have leaked the Report.

Despite the serious, known problems with training, Bates was not counseled or disciplined in any fashion, and his actions in the field were not limited as they should have been. In 2009, Bates participated in firearm qualification testing at the firing range under the supervision of Sergeant Kitch. Bates was verbally reprimanded more than once for "dangerous behavior with his weapon," which included pointing his firearm in a manner which exposed other participants "to being shot." In response to the reprimand, Bates was angry and refused to complete the firing range round, which resulted in a failing score. Glanz contacted Kitch and directed him to "take it easy" on Bates and to "pass him." Glanz knew that Bates had received special treatment, did not have the requisite training necessary to operate as an Advanced Reserve Deputy and was not being adequately supervised, and Glanz himself actively participated in the preferential treatment. Glanz instructed full-time deputies to refrain from enforcing TCSO policies when it involved Bates, establishing a clear pattern of behavior to excuse Bates from the written policy requirements that even full-time deputies were required to follow.

Glanz knew that allowing Bates to operate as an Advanced Reserve Deputy posed an excessive and substantial risk that citizens' constitutional rights would be violated, but he disregarded those known, substantial risks. In addition, Glanz and TCSO provided highly

preferential treatment to Bates by knowingly failing to enforce their own Reserve Deputy policies, training and supervision requirements for the benefit of Bates. Glanz knew that Bates posed a specific risk and was dangerously deficient in the handling of a firearm, and he sought to cover up these dangerous deficiencies for the benefit of Bates, who was his friend and benefactor. In disregard for the known, obvious, and substantial risks to the public, Glanz and TCSO permitted Bates to repeatedly participate in highly dangerous law enforcement operations, without the necessary supervision, training, or certification. Harris died as a result.

Based on the foregoing allegations, plaintiff asserts claims under 42 U.S.C. § 1983 for excessive force and deliberate indifference to serious medical needs, and she asserts that Glanz is liable in his individual capacity for supervisory liability and that Sheriff Regalado is liable in his official capacity. All defendants move to dismiss.

## II. Dismissal Standards

In considering a Rule 12(b)(6) motion to dismiss, the Court must determine whether plaintiff has stated a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The standard requires "enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* at 555-56, 570 (citations omitted). *Twombly* articulated the pleading standard for all civil actions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). The Court must accept all the well-pleaded factual allegations of the complaint as true, even if doubtful, and must construe the allegations in the light most favorable to claimant. *See Twombly*, 550 U.S. at 555.

The dismissal standard does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face," and the factual allegations "must be enough to raise a right to relief above the speculative level." *Id*. at 555-56, 570 (citations omitted). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]. And, of course, a well-pleaded [pleading] may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id*. at 556. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563.

### III. Discussion

#### A. Robert Bates

Mr. Bates moves for dismissal, asserting that the Complaint fails to state a claim against him because the shooting was accidental. At this stage, however, the Court must accept the factual allegations of the Complaint as true, and those allegations place in issue whether Bates's conduct was a mistake. Plaintiff has alleged that Bates did *not* mistake his gun for his Taser. Plaintiff also alleges that even the use of a Taser on a subdued, non-fleeing, unarmed person would have been excessive. The facts alleged as to Bates – that he used deadly force on an unarmed, subdued person who was not fleeing – state a plausible claim for excessive force against Bates.

Bates also contends that plaintiff has not stated a claim against him for deliberate indifference to serious medical needs. Again, at the pleading stage, the allegations of the Complaint, which include that Bates wasted time in obtaining emergency medical treatment for Harris after shooting him, state a plausible claim for deliberate indifference to Harris's obvious

and serious medical needs. Whether evidence will ultimately support such a claim is not before this Court at this phase.

Bates also asserts that he is entitled to qualified immunity. Where qualified immunity is raised at the dismissal stage, the Court must accept all well-pleaded allegations as true and view them in a light most favorable to the plaintiffs. *See Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). "To survive a motion to dismiss based on qualified immunity, the plaintiff must allege sufficient facts that show – when taken as true – the defendant plausibly violated [plaintiff's] constitutional rights, which were clearly established at the time of the violation." *Id.* Thus, the first prong of the analysis is whether the allegations plausibly show that (1) "the defendant's actions violated a federal constitutional or statutory right," and (2) the second prong asks whether "the right was clearly established at the time of the defendant's unlawful conduct." *See T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (citation omitted). If the plaintiff fails to satisfy either prong of the inquiry, then the defendant is entitled to qualified immunity. *See id.* (citing *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)).

As noted above, the facts alleged in the Complaint state plausible claims against Bates for excessive force and deliberate indifference to serious medical needs, satisfying the first prong of the qualified immunity analysis. With respect to the second component of the qualified immunity analysis, to show clearly established law, a plaintiff must generally identify a Supreme Court or Tenth Circuit opinion which existed at the time of the alleged violation. *Id.* The existing precedent "must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015)). While the precedent need not be "directly on point," *White*, 137 S. Ct. at 551, the "right's contours" must have been "'sufficiently definite that any reasonable official in [the official's] shoes would

have understood that he was violating it.'" *T.D. v. Patton*, 868 F.3d at 1220 (quoting *City & Cty. Of San Francisco v. Sheehan*, __ U.S. __, 135 S. Ct. 1765, 1774 (2015)). The right must not be defined at a "high level of generality," but "must be 'particularized' to the facts of the case." *Id.* at *9 (quoting *Sheehan*, 135 S. Ct. at 1776 and *White*, 137 S. Ct. at 552).

Bates alleges that he is entitled to qualified immunity because he mistakenly pulled his gun instead of his Taser. As noted, plaintiff alleges that Bates did not mistake his revolver for the Taser and that, even if he had, use of the Taser on an unarmed, subdued, non-fleeing person would also have been objectively unreasonable. Those allegations state plausible claims against Bates for excessive force in violation of the Constitution, as provided by clearly established law predating the 2015 shooting of Mr. Harris. *See, e.g., Estate of Booker v. Gomez*, 745 F.3d 405, 428 (10th Cir. 2014) ("there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect or detainee who already has been subdued and does not present a danger to himself or others"); *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) ("it is clearly established law that deadly force cannot be used when it is unnecessary to restrain a suspect or secure the safety of officers, the public, or the suspect himself"); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666-67 (10th Cir. 2010) (use of Taser could constitute excessive force where reasonable jury could conclude that the plaintiff did not pose an immediate threat to the officer or anyone at the scene); *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1281-82, 1286 (10th Cir. 2007) ("it is excessive force to use a Taser to control a target without having any reason to believe that a lesser amount of force . . . could not exact compliance").

While the Court recognizes that the clearly established right is not to be defined "at a high level of generality," it is also true that "'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness

must be apparent." *White*, 137 S. Ct. at 552 (citations omitted). Thus, the Supreme Court has held that *Tennessee v. Garner*, 471 U.S. 1 (1985) and *Graham v. Connor*, 490 U.S. 386 (1989) do not by themselves create clearly established law outside "an obvious case." *Id.* (quoting *Brosseau v. Haughen*, 543 U.S. 194, 199 (2004). At the dismissal stage, taking the factual allegations of plaintiff's Complaint as true, the issue here is whether the law was clearly established as of April 2, 2015, that drawing a gun and shooting a man who is unarmed and already subdued on the ground by multiple deputies constitutes excessive force. Assuming the truth of those allegations as the Court must at this stage, such conduct would appear to constitute "an obvious case" of excessive force under clearly established legal norms. *See Booker*, 745 F.3d at 428 (agreeing with Sixth Circuit's analysis, and stating that "'there undoubtedly is a clearly established legal norm' precluding the use of violent physical force against a criminal suspect or detainee 'who already has been subdued and does not present a danger to himself or others"). The facts alleged are that Mr. Harris had been tackled, had two or four deputies holding him down, he was subdued, and was not fleeing, and Bates drew a revolver and shot him in the back while he was being held on the ground. Those facts, as alleged, would clearly constitute excessive force.[1]

Mr. Bates's motion to dismiss (Doc. 24) is accordingly **denied**.

---

[1] This determination of qualified immunity is made as to the *dismissal* stage only. Although courts will consider qualified immunity at the dismissal stage, "qualified immunity defenses are typically resolved at the summary judgment stage. . . ." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014); *see also Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004). Asserting qualified immunity at the dismissal stage subjects the defendant raising it to a more challenging standard than would apply at the summary judgment stage, because one is a pleading standard whereas the other involves evidence. *See Peterson*, 371 F.3d at 1201. And, because "discovery may inform the context [of the individual defendants'] actions . . .," the "'denial of qualified immunity at the dismissal stage does not preclude a renewal of that defense at summary judgment after further factual development has occurred.'" *Schwartz*, 702 F.3d at 587 (quoting *Weise v. Casper*, 507 F.3d 1260, 1265 (10th Cir. 2007)).

## B. Michael Huckeby, Joseph Byars, and Ricardo Vaca

Defendants Huckeby, Byars, and Vaca move to dismiss the Fourteenth Amendment claim for deliberate indifference to serious medical needs, and Byars and Vaca assert qualified immunity as that claim is the only one asserted against them.[2] As noted, considering qualified immunity at the dismissal stage requires the Court to accept all well-pleaded allegations as true and view them in a light most favorable to the plaintiffs. *See Schwartz*, 702 F.3d at 579. The allegations of the Complaint must contain sufficient factual allegations to show that the defendants plausibly violated plaintiff's constitutional rights and that such rights were clearly established at the time.

These defendants argue that the Complaint alleges that an ambulance was immediately summoned. Although the Complaint includes allegations that emergency medical help was summoned and arrived seven minutes later, the timeline *before* the call for medical help is not established by the Complaint, and the plaintiff alleges that these defendants delayed seeking emergency medical care after Bates shot Harris and that the defendants were deliberately indifferent to Harris's obvious medical needs. At the pleading stage, that is sufficient to allege the violation of a clearly established constitutional right. A person who is injured while being apprehended by the police has a due process right to have the responsible state actor provide medical aid. *See City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983). An officer can satisfy that obligation by promptly summoning emergency help. *See id.* Reading the Complaint in the light most favorable to the plaintiff, the Complaint alleges facts that plead plausible claims that these officers delayed / deprived Harris of prompt medical care and were deliberately indifferent to his known, obvious and serious medical needs.

---

[2]  Huckeby has not asserted qualified immunity at this stage of the proceeding.

The defendants ask the Court to assume that they immediately called for emergency medical care. However, the allegations of the Complaint are to the contrary, and the Court must accept those allegations as true at this stage of the proceeding. The law is clearly established that arresting officers violate the constitutional rights of detainees when they are deliberately indifferent to a detainee's serious medical needs, and that even a short delay in obtaining medical care where the officer knows of and disregards an excessive risk to the detainee's health or safety may be found unconstitutional. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315-17 (10th Cir. 2002); *Booker*, 745 F.3d at 433-34; *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

Deliberate indifference includes subjective and objective components. *Olsen*, 312 F.3d at 1315. The objective component requires that the deprivation be sufficiently serious, while the subjective component is satisfied if the officer knows of and disregards an excessive risk to the detainee's health or safety. *Id.* Being shot and asserting difficulty breathing, which Harris allegedly did according to the Complaint, reflects a sufficiently serious condition meeting the objective component. The subjective component is met at the pleading stage by the allegations in the Complaint that the officers knew of and disregarded an excessive risk to Mr. Harris's health. *See Mata*, 427 F.3d at 751. The Complaint states a plausible claim against the individual defendants under the Fourteenth Amendment for violation of a constitutional right which was clearly established at the time.

The motion to dismiss of Huckeby, Byars, and Vaca (Doc. 11) is **denied**.

C.     **Former Sheriff Glanz**

In his dismissal motion, Mr. Glanz asserts that the Complaint does not state a claim against him for excessive force because there is no allegation that Glanz "personally participated in causing Eric Harris'[s] alleged constitutional deprivation [or that] he was privy to any information

15

that would allow a reasonable finder of fact to conclude that he ignored an excessive risk of harm to Eric Harris." (Doc. 10 at 5-6). Yet, Glanz recognizes that personal liability may be imposed under *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). (*See* Doc. 10). Under *Dodds*, an official may be personally liable where he "(1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Id.* The Tenth Circuit has also identified these requirements as "(1) personal involvement; (2) sufficient causal connection; and (3) culpable state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013); *see also Harte v. Bd. Of Commissioners of Johnson County, Kan.*, 864 F.3d 1154, 1194 (10th Cir. 2017) (citing *Schneider* and *Dodds*). The plaintiff must allege an "affirmative link" between a supervisory official and the constitutional violation. *Schneider*, 717 F.3d at 767.

Accepting the allegations of the Complaint as true, plaintiff has stated claims for individual liability against Glanz. Those allegations include that Glanz was responsible for policies of providing preferential treatment to his long-time friend and financial supporter, Robert Bates, which included exempting Bates from mandatory training requirements that were established to protect the public, with deliberate indifference to the known, excessive risks to the public who would encounter Bates. The Complaint asserts that Glanz knew that (1) Bates was operating in the field, without supervision, despite lacking hundreds of hours of required field training, (2) Bates failed to meet firearms requirements, (3) Bates was not qualified to operate in the field, and (4) Bates's training records had been falsified to make it appear as if he had received proper training. Plaintiff has also alleged that the supervisory authority of TCSO employees involved with the Reserve Deputy Program was removed when those employees challenged Bates's

16

qualifications and raised issues regarding Bates's actions in the field. Despite the known lack of training and other serious problems with Bates, Glanz is alleged to have authorized Bates to continue serving in the field, on the Violent Crimes Task Force, and in numerous dangerous operations, while knowingly subjecting the public to serious risk of danger.

Based on the foregoing, plaintiff has stated a plausible claim against Glanz for maintenance of special policies put in place for Robert Bates, which led to the death of Mr. Harris from excessive force by Bates, and that Glanz had the requisite state of mind. *See Dodds*, 614 F.3d at 1199; *Schneider*, 717 F.3d at 767. Whether that claim will survive summary judgment has yet to be seen, but the allegations of the Complaint, taken as true and construed in a light favorable to plaintiff, states a plausible claim against Glanz at the pleading stage.

Plaintiff clarifies that she does not wish to maintain any claim against Glanz for violation of Mr. Harris's Fourteenth Amendment rights to be free from deliberate indifference to his medical needs.³ Accordingly, Glanz's request for dismissal of such a claim under the Fourteenth Amendment is moot. The Court also need not analyze Glanz's arguments for dismissal of an official capacity claim or claim for punitive damages against him in his official capacity, because the Complaint indicates that he is sued only in his individual capacity, and he was no longer the sheriff at the time plaintiff filed the Complaint. (*See* Doc. 2).

Mr. Glanz also argues that he is entitled to qualified immunity. As noted, at the pleading stage, the plaintiff must "allege sufficient facts that show – when taken as true – the defendant plausibly violated his constitutional rights, which were clearly established at the time of violation."

---

³ The Complaint lists Mr. Glanz in the heading of the claim under the Fourteenth Amendment for deliberate indifference to serious medical needs. (*See* Doc. 2 at 35). Given that plaintiff now asserts that she does not intend to maintain such a claim against Glanz, the Court will consider that claim to have been withdrawn as to Glanz.

*See Schwartz*, 702 F.3d at 579. As discussed above, the plaintiff has alleged facts which, taken as true, plausibly state a claim that Glanz violated Harris's constitutional rights. Plaintiff identifies a number of cases as reflecting that such rights were clearly established at the time of Mr. Harris's death. Among them, *Dodds* provides that "other cases of ours and the great weight of authority from other circuits clearly established by 2007 that officials may be held individually liable for policies they promulgate, implement, or maintain that deprive persons of their federally protected rights." 614 F.3d at 1207.[4]

Construing the allegations of the Complaint in plaintiff's favor, the Court concludes that plaintiff has stated a plausible claim against Mr. Glanz based upon special policies he established with respect to Mr. Bates, with deliberate indifference to the safety of citizens with whom Bates would come into contact, and which policies "set in motion a series of events that [Glanz] knew or reasonably should have known would cause others to deprive [Mr. Harris] of [his] constitutional rights." *See Estate of Booker*, 745 F.3d at 435 (quoting *Schneider*, 717 F.3d at 768). The Complaint contains numerous, specific allegations that Glanz personally participated in implementing special policies as to Bates which permitted him to carry a weapon, act as an Advanced Reserve Deputy, and participate in dangerous operations in which force may be used, without proper training, competency, and ability. The Complaint also alleges that Glanz personally participated in covering up the lack of training, falsification of training records, and lack of basic competency while knowing that Bates posed a serious risk to the safety of Tulsa County citizens. Mr. Glanz's motion to dismiss (Doc. 10) is **denied**.

---

[4] The Tenth Circuit continues to cite the *Dodds* principles as applicable law in the analysis of policy-making officials' personal participation. *Schneider*, 717 F.3d at 767; *see also Harte*, 864 F.3d at 1194 (2017 decision citing *Dodds* principle of personal participation); *Keith v. Koerner*, 843 F.3d 833, 838-49 (10th Cir. 2016) (citing *Dodds* principles); *Estate of Booker*, 745 F.3d at 435-36.

### D. Official capacity / municipal liability

A suit against an official in his or her official capacity is the same as asserting a claim against the municipality or county the official represents and is considered under the standards applicable to 42 U.S.C. § 1983 claims against municipalities or counties. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Sheriff Regalado's predecessor filed a motion to dismiss, asserting that plaintiff's Complaint does not state a claim for official capacity liability under *Monell v. New York City Dep't of Soc, Servs.*, 436 U.S. 658 (1978). A municipality may not be held liable under § 1983 solely because its employee inflicted injury; municipal liability cannot be found by application of the theory of respondeat superior. *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "[L]ocal governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). To hold a county liable under § 1983, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell*, 436 U.S. at 694 (citations omitted).

The extensive allegations of the Complaint in this case, taken as true, satisfy *Monell*. Among other things, plaintiff's allegations indicate that the superiors at the TCSO, including the Sheriff at the time (Glanz), permitted Bates to act as an Advanced Reserve Deputy, carry a weapon, be involved in dangerous operations, and be in situations that would permit him to use deadly force, without proper training, competency, and ability. Indeed, the plaintiff alleges that training

was falsified, policies put in place to protect the public were blatantly ignored in order to allow Bates to "play cop," and regular TCSO employees who brought Bates's alleged incompetence and lack of training to the attention of senior TCSO officials were ignored, silenced, moved from their supervisory positions over Bates, and/or subject to retaliation for raising any issue regarding Bates. Plaintiff also alleges that those senior officials sought to cover up the lack of training and serious threat posed by Bates, at least in part because he was a long-time friend and supporter of Glanz and because he donated equipment to the TCSO. The allegations of the Complaint state a plausible claim under *Monell*.

The Sheriff argues for dismissal of any punitive damages claim, as such damages are not recoverable against municipalities under *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). Plaintiff represents that she is not seeking punitive damages against the Sheriff on the official capacity claim. That issue is thus moot.

The Sheriff's motion to dismiss (Doc. 12) is **denied**.

**SO ORDERED** this 9th day of November, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE